UNITED STATES DISTRICT COURT
DISTRICT OF MONTANA
BUTTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | |
| (1) JAMES TARPEY; | ) | Jury Trial Not Demanded |
| (2) PROJECT PHILANTHROPY, INC. | ) | |
| d/b/a DONATE FOR A CAUSE; | ) | |
| (3) TIMESHARE CLOSINGS, INC. | ) | |
| d/b/a RESORT CLOSINGS, INC.; | ) | |
| (4) RON BROYLES; | ) | |
| (5) CURT THOR; and | ) | |
| (6) SUZANNE CROWSON | ) | |
| f/k/a SUZANNE TARPEY; | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT FOR PERMANENT INJUNCTION AND OTHER RELIEF

The United States alleges as set forth below.

### NATURE OF THE ACTION

1. Defendants organize, operate, and promote an elaborate – and bogus – tax scheme. This scheme encourages timeshare owners to donate their unwanted timeshares to Donate for a Cause, a tax-exempt entity organized and operated by James Tarpey. Tarpey's customers (the timeshare owners) pay significant processing fees to Tarpey's for-profit closing company, called Resort Closings, Inc., for the transfer of the timeshares. Appraisers with a conflict of interest

appraise the customers' timeshares in a manner which does not comply with the law and which significantly overvalues the timeshares. Relying on Tarpey's false representations, Tarpey's customers then claim improper and grossly inflated charitable contribution deductions on their tax returns for both the overvalued timeshares and the processing fees paid to Resort Closings, Inc.

2. Donate for a Cause is simply used as a conduit to briefly hold title to timeshares before they are sold for a fraction of the appraised amount.

3. The IRS estimates that since 2010, defendants have caused customers to donate 5,523 timeshares to this scheme. Based on a review of only 2,994 of these customers' files, the IRS determined that defendants have caused more than $19.4 million in improper tax deductions for the timeshares alone.

4. The United States brings this complaint pursuant to 26 U.S.C. §§ 7402 and 7408 to enjoin each defendant from directly or indirectly:

    (a) preparing (or assisting others in preparing) any property appraisal that will be used in connection with federal taxes;

    (b) encouraging or advising (or assisting others in encouraging or advising) others to claim charitable contribution deductions on any federal tax return; and

    (c) organizing, promoting, selling, marketing or advising with respect to (or assisting others in organizing, promoting, selling, marketing or advising with respect to) any plan or arrangement regarding charitable contribution deductions claimed on federal tax returns.

## AUTHORIZATION

5. This action for injunctive relief is brought at the request of the Chief Counsel of the Internal Revenue Service, a delegate of the Secretary of the Treasury, and commenced at the direction of a delegate of the Attorney General of the United States.

## JURISDICTION AND VENUE

6. This Court has jurisdiction under 28 U.S.C. §§ 1340 and 1345, and 26 U.S.C. §§ 7402(a) and 7408(a).

7. Venue is proper in this Court because the defendants engaged in the penalty conduct at issue in this judicial district and a substantial part of the events giving rise to the claims herein occurred in this judicial district. 26 U.S.C. § 7408(a); 28 U.S.C. § 1391(b).

## DEFENDANTS

8. **JAMES TARPEY** resides in Bozeman, Montana. Tarpey graduated from DePaul University in Chicago and obtained his law degree from the University of Denver in 1998. Tarpey is the architect of this timeshare donation scheme, has promoted it to others, and has reaped substantial financial gain from selling and operating it. Tarpey is subject to this Court's jurisdiction pursuant to Mont. R. Civ. P. 4(b)(1) because he resides in this judicial district.

9. **PROJECT PHILANTHROPY, INC.** is a tax-exempt District of Columbia corporation and operates under the business name **DONATE FOR A CAUSE**. Donate for a Cause has its principal place of business and operational headquarters located at 3701 Trakker Trail, Unit 2J, Bozeman, Montana, 59718. Donate for a Cause is the entity to which customers donate their timeshares. Donate for a Cause functions and communicates through Tarpey and other individuals. Donate for a Cause is subject to this Court's jurisdiction pursuant to Mont. R. Civ. P. 4(b)(1) because its principal place of business and operational headquarters is located in this judicial district.

10. **TIMESHARE CLOSINGS, INC.** is a Colorado corporation and operates under the business name **RESORT CLOSINGS, INC.** Resort Closings has its principal place of business and operational headquarters located at 3701 Trakker Trail, Unit 2J, Bozeman, Montana, 59718. Resort Closings is the company that transfers ownership of the timeshares from the defendants' customers to Donate for a Cause. Resort Closings functions and communicates through Tarpey and other individuals. Resort Closings is subject to this Court's jurisdiction pursuant to Mont. R. Civ. P. 4(b)(1) because its principal place of business and operational headquarters is located in this judicial district.

11. **RON BROYLES** is a real estate appraiser who resides in San Rafael, California. Broyles is the primary appraiser for Donate for a Cause. He has

prepared thousands of appraisals for Donate for a Cause since 2010. Virtually all of Broyles' appraisal business consists of appraisals prepared for Donate for a Cause.

12. Broyles, a California resident, is subject to this Court's jurisdiction pursuant to Mont. R. Civ. P. 4(b)(1) because this suit arises from the extensive appraisal work he provided for Donate for a Cause, which has its principal place of business and operational headquarters in Bozeman, Montana. Broyles prepared thousands of appraisals for Donate for a Cause over the course of several years. Further, the penalty conduct at issue is based on Broyles' forum-based activities (i.e., preparing appraisals for customers seeking to donate their timeshares to Donate for a Cause).

13. **CURT THOR** is a real estate appraiser and resides in Bellingham, Washington. Thor has prepared more than one thousand appraisals for Donate for a Cause since 2011.

14. Thor, a Washington resident, is subject to this Court's jurisdiction pursuant to Mont. R. Civ. P. 4(b)(1) because this suit arises from the extensive appraisal work he provided for Donate for a Cause, which has its principal place of business and operational headquarters in Bozeman, Montana. Thor prepared more than one thousand appraisals for Donate for a Cause over the course of several years. Further, the penalty conduct at issue is based on Thor's forum-based

activities (i.e., preparing appraisals for customers seeking to donate their timeshares to Donate for a Cause).

15. **SUZANNE CROWSON** is Tarpey's sister. She resides in Bozeman, Montana. Crowson has been an officer of Donate for a Cause and has prepared more than one hundred appraisals for that entity. Crowson is subject to this Court's jurisdiction pursuant to Mont. R. Civ. P. 4(b)(1) because she resides in this judicial district.

### OVERVIEW OF THE TIMESHARE DONATION SCHEME

16. Since at least 2010, and continuing to the present, defendants have promoted an abusive tax scheme that results in their customers claiming federal income tax deductions to which the customers are not entitled.

17. Timeshares provide joint ownership in vacation properties. Among other benefits, timeshare owners can save money on travel expenses, as most timeshares are equipped with a kitchen and laundry facilities. Timeshare owners also avoid hotel fees and guarantee themselves a vacation destination, although they are responsible for the cost of travel to the timeshare location. In addition to purchase costs, timeshares typically require annual maintenance fees and other expenses that may include membership fees and real estate taxes.

18. Some people who have purchased a timeshare later decide they no longer wish to own that property.

19. However, timeshare owners often face substantial difficulty in selling or even giving away their unwanted timeshares. This is due to the large costs associated with owning a timeshare, the excess supply of timeshares on the resale market, and competition from developers.

20. Defendants' timeshare donation scheme is designed to exploit the difficulties in the timeshare resale market. Timeshare owners are encouraged to "donate" their timeshares and claim improper federal tax deductions. They are falsely promised "generous" tax savings purportedly based on an independent fair market value determination.

21. The timeshare donation scheme has been aggressively marketed via the internet and through national and local media outlets.

22. When a prospective customer contacts Donate for a Cause, either by email, phone, or the internet, a "donation specialist" pitches the donation program and obtains basic information about the timeshare. Initial documents, such as the donation agreement, consent form, and a questionnaire about the timeshare are sent to the customer.

23. Donate for a Cause then opens a new file with Resort Closings, the entity that transfers ownership of the timeshare. The case file is assigned to an employee of Resort Closings (referred to as the "closing agent").

24. The customer pays significant upfront fees to Resort Closings (often in excess of $2,000).

25. Next, to purportedly determine the "fair market value" of the timeshare, Donate for a Cause enlists the services of an appraiser. But instead of selecting an independent, third-party appraiser, Donate for a Cause uses an appraiser who will overstate the value of the timeshare. As explained below, this appraiser is an insider who is too closely affiliated with Donate for a Cause and thus the Treasury regulations specifically exclude him or her from appraising timeshares for which customers claimed federal tax deductions.

26. The appraisals typically suffer from numerous additional defects. They fail to comply with regulations governing appraisals submitted with federal tax returns, contain substantive errors and omissions, fail to comply with generally accepted appraisal standards, and grossly overvalue the timeshares.

27. Donate for a Cause issues two donation acknowledgment letters upon receipt of the timeshare. It issues a cash acknowledgment letter for the processing fees paid to Resort Closings and a non-cash acknowledgment letter for the overvalued timeshare.

28. Customers are falsely told that they can fully deduct on their federal income tax return the appraised amount of the timeshare and the processing fees.

29. Once the timeshare is accepted into the scheme, closing agents are responsible for transferring title. Closing agents must perform two closings: one from the customer to Donate for a Cause, and another from Donate for a Cause to the ultimate buyer. Closing agents create a "checksheet," similar to a real estate settlement sheet, for each timeshare, which tracks the flow of funds associated with the closings.

30. Once the timeshare is deeded to Donate for a Cause, employees of Donate for a Cause and Resort Closings advertise it for sale. Most timeshares are advertised and sold through the online auction site eBay.

31. Defendants obtain revenue from the processing fees that the customer pays and from the sale of the timeshares.

32. Since 2010, the timeshare donation scheme has generated more than $17.6 million in total revenue, yet Donate for a Cause has made charitable contributions of less than $1.5 million.

## DEFENDANTS' ROLES IN THE SCHEME

33. James Tarpey controls the various entities that he uses to operate the scheme and pays the insiders who prepare appraisals for the scheme.

34. On August 31, 2004, Tarpey incorporated an entity called Donate for a Cause, Inc. Tarpey controlled that entity and was its president, registered agent, and chairman.

35. On October 18, 2004, Tarpey applied to the IRS for tax-exempt status on behalf of Donate for a Cause, Inc.

36. However, the IRS raised concerns about the close relationship between Tarpey and Donate for a Cause, Inc., and concluded that Donate for a Cause, Inc. improperly benefited Tarpey and Tarpey's various companies. Accordingly, on October 17, 2005, the IRS denied tax-exempt status to Donate for a Cause, Inc. Tarpey voluntarily dissolved that entity a few months later.

37. On March 15, 2006, Tarpey caused the formation of a new entity called Project Philanthropy, Inc. In order to obtain tax-exempt status, Tarpey disguised his involvement and control of Project Philanthropy, Inc. by installing his brother, Matthew Tarpey, as the purported president of Project Philanthropy, Inc.

38. Project Philanthropy, Inc. quickly filed papers to use "Donate for a Cause" as its assumed business name.

39. On May 25, 2006, Matthew Tarpey applied for tax-exempt status on behalf of Projective Philanthropy, Inc., now doing business as Donate for a Cause, which the IRS granted on June 25, 2006.

40. However, James Tarpey continues to control all aspects of Donate for a Cause. Tarpey is its sole voting member and has been identified as its chairman and president. He attends its annual meetings and board meetings, is an authorized

signatory on its bank account, and manages its employees. He is also a point of contact on the eBay account that Donate for a Cause uses to sell the timeshares.

41. Tarpey uses Resort Closings to perform real estate closings for the timeshares and to lease office space to Donate for a Cause. Tarpey is the 100% owner, president, CEO, chairman, and counsel for Resort Closings.

42. Tarpey has appraised at least 647 timeshares since 2010 in connection with the timeshare donation scheme.

43. Tarpey has earned millions of dollars from his promotion of the timeshare donation scheme.

44. Broyles, the primary appraiser for timeshares donated to Donate for a Cause, has appraised at least 4,486 timeshares since 2010 in connection with the timeshare donation scheme.

45. In 2011, Broyles received more than $150,000 in connection with the timeshare donation scheme. That amount constituted 100% of his gross business income in 2011. In 2012, Broyles received approximately $160,000 in connection with the timeshare donation scheme. That amount constituted more than 97% of his gross business income in 2012. In 2013, Broyles received more than $243,000 in connection with the timeshare donation scheme. That amount constituted 100% of his gross business income in 2013.

46. Thor has appraised at least 1,458 timeshares since 2011 in connection with the timeshare donation scheme.

47. In 2011, Thor performed research and determined values for many of Broyles' timeshare appraisals, yet he failed to disclose that he performed significant work on these appraisals. For his efforts, Thor received approximately $68,000 in connection with the timeshare donation scheme in 2011. In 2012, Thor received approximately $144,000 in connection with the timeshare donation scheme. That amount constituted 57% of his gross business income in 2012.

48. Crowson appraised at least 101 timeshares in 2012 in connection with the timeshare donation scheme, and may have prepared an additional 448 timeshares in 2013.

49. Crowson was the secretary and treasurer of Donate for a Cause between 2006 and 2011. She attended the annual meetings, board meetings, and special meetings for Donate for a Cause. She signed contracts on behalf of Donate for a Cause and was an authorized signatory on the bank account that Donate for a Cause has with Wells Fargo. Crowson was also the bookkeeper for Resort Closings.

## DEFENDANTS' TIMESHARE DONATION SCHEME
## FLAGRANTLY ABUSES THE INTERNAL REVENUE LAWS

50. Section 170 of the Internal Revenue Code sets forth a number of requirements that must be met before a taxpayer can claim a charitable

contribution deduction.  The level of substantiation required of taxpayers who claim a charitable contribution deduction varies depending on the amount of the claimed deduction.  For example, if a contribution of property results in a deduction claimed for that property of more than $5,000, the taxpayer must obtain a "qualified appraisal" of that property which must be prepared by a "qualified appraiser."

51. Defendants use bogus appraisals to generate excessive profits for themselves and improper charitable contribution deductions for their customers.

52. The appraisals are bogus because defendants are excluded by law from preparing appraisals, because defendants use phony methods to value the timeshares, and because defendants' appraisals contain pervasive errors and omissions.  As a result, the appraisals fail to comply with regulations governing appraisals submitted with federal tax returns and fail to meet professional appraisal standards.

53. Since at least 2010, Tarpey has held himself out as a professional appraiser of timeshares and has appraised at least 647 timeshares in connection with the timeshare donation scheme.

54. Since at least 2010, Broyles has held himself out as a professional appraiser of timeshares and has appraised at least 4,486 timeshares in connection with the timeshare donation scheme.

55. Since at least 2011, Thor has held himself out as a professional appraiser of timeshares and has appraised at least 1,458 timeshares in connection with the timeshare donation scheme.

56. Since at least 2012, Crowson has held herself out as a professional appraiser of timeshares and has appraised at least 101 timeshares in connection with the timeshare donation scheme. She may have appraised an additional 448 timeshares in 2013.

*Defendants Are Excluded by Law from Preparing Appraisals*
*for Property Donated to Donate for a Cause*

57. Defendants have an economic and personal interest in the appraisals they prepare for Donate for a Cause, and therefore the applicable Treasury regulations specifically exclude them from appraising property donated to that entity for which their customers claimed federal tax deductions. In other words, they are not neutral, third-party appraisers, but instead are insiders with strong incentives to skirt the rules and manipulate the value of donated property.

58. Tarpey is excluded by law from serving as a "qualified appraiser" for property donated to Donate for a Cause because of his close relationship to that entity. For example, he is the sole voting member of and controls Donate for a Cause, and earns income from its operations. Tarpey is also excluded because virtually all of his appraisal business consists of appraisals prepared for Donate for

a Cause. He also owns and controls Resort Closings, which is the entity that Tarpey often identifies as the "client" for whom he prepares appraisals.

59. Broyles is excluded by law from serving as a "qualified appraiser" because virtually all of his appraisal business consists of appraisals prepared for Donate for a Cause.

60. Thor was excluded by law in 2012 from serving as a "qualified appraiser" because a majority of his appraisal business for that year consisted of appraisals prepared for Donate for a Cause.

61. Crowson is excluded by law from serving as a "qualified appraiser" because she is Tarpey's sister, and as such, is excluded from appraising property to be donated to her brother's charity. Crowson has been an employee of Donate for a Cause, and is excluded from preparing appraisals for property donated to her employer. Crowson is also excluded from serving as a "qualified appraiser" because she has been an officer of Donate for a Cause, which is the donee of the property.

62. Defendants are also excluded by law from serving as a "qualified appraiser" because they fail to disclose these exclusions to their customers.

63. Defendants are not qualified to appraise timeshares because they fail to meet education and experience requirements.

64. Defendants encourage prospective customers to use their appraisal services despite being excluded by law from preparing appraisals for timeshares donated to Donate for a Cause.

*Defendants Use Phony Methods to Value Donated Property*

65. The amount of the charitable contribution deduction under section 170(a) is generally based upon the fair market value of the property at the time of the donation. Fair market value is defined as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts."

66. Defendants utilize a number of methods to purposefully and grossly inflate the appraised value of timeshares.

67. Defendants fail to apply a legally permissible definition of "fair market value" which renders their appraisals inaccurate and inconsistent with internal revenue rules and regulations and the standards applicable to professional appraisers of real property.

68. Defendants purposefully do not attempt to reach the required definition of "fair market value" and instead employ a definition of value that is contrary to the governing regulations and standards. Defendants improperly use a new species of value called "market value." As set forth in their appraisals, defendants assert

that "market value" is the "most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus."

69. Tarpey encourages his appraisers, including Thor, to manipulate the statutory definition of "fair market value" to inflate the appraised value of worthless timeshares.

70. Defendants use various techniques in order to avoid reaching the property's fair market value. For example:

    a. defendants use active sales *listings* instead of closed sales;

    b. even when defendants consider closed sales, they fail to include basic information such as the date of sale and fail to verify the condition of the property sold;

    c. defendants fail to indicate whether the comparable sales are resales or developer sales;

    d. defendants approximate the original price paid by the customer;

    e. defendants ignore sales data from eBay, the market in which they have sold thousands of the timeshares;

    f. defendants specifically admit that they have failed to inspect the timeshare; and

g. defendants advertise a predetermined appraisal result.

71. The improper methods that defendants employ when appraising timeshares result in grossly overvalued appraisals, which then result in grossly overstated tax deductions.

72. The IRS reviewed a sample of 303 appraisals that defendants prepared for timeshares that were subsequently sold on eBay in 2010. The average appraisal amount for these 303 timeshares was $11,187, yet they only generated an average sales price of $383 when sold on eBay – only 3.4% of the appraised amount.

73. The IRS reviewed a sample of 1,134 appraisals that defendants prepared for timeshares that were subsequently sold on eBay in 2011. The average appraisal amount for these timeshares was $11,384, yet they only generated an average sales price of $377 when sold on eBay – only 3.3% of the appraised amount.

74. The IRS reviewed a sample of 1,557 appraisals that defendants prepared for timeshares that were subsequently sold on eBay in 2012. The average appraisal amount for these timeshares was $10,619, yet they only generated an average sales price of $429 when sold on eBay – only 4% of the appraised amount.

75. In total, defendants sold 5,505 timeshares on eBay which yielded total sale proceeds of $2.2 million. More than 50% of these sales generated $100 or less in sales proceeds, while almost 90% generated less than $1,000 in sales proceeds.

*Defendants' Appraisals Contain Errors and Omit Mandatory Information*

76. Defendants fail to include mandatory information in the appraisals they prepare for the timeshares.

77. The timeshare appraisals do not contain a sufficiently detailed property description, but instead often contain boilerplate language taken from timeshare websites. The appraisals often lack the names of the buyer and seller, deed book and page number, neighborhood, and other information that would allow a person unfamiliar with the property to ensure that the appraised property is the property to be donated.

78. The appraisals do not identify the date (or expected date) of contribution to the donee. Instead, defendants often select an arbitrary date roughly contemporaneous with the time of engagement (i.e., the date when the appraisers were engaged to prepare the appraisal). Incredibly, defendants have even used a contribution date that falls *after* the sales date.

79. The appraisals do include some data about the qualifications of the various appraisers, but do not include any information about their qualifications with respect to timeshares or to the geographic areas in which those properties are located.

80. If a donee sells donated property within three years of the contribution date, the donee must generally complete IRS Form 8282 in order to report certain

information to the IRS and to the donor, including the sales price. Defendants have fabricated the actual sales price on these forms. For example, when defendants sold a timeshare for less than $100, they generally inflated the sales price to $100 on IRS Form 8282.

81. Defendants erroneously claim that their appraisals meet the requirements of the Uniform Standards of Professional Appraisal Practice, the authoritative guide for professional real estate appraisers.

*Additional Abusive Characteristics of Defendants' Timeshare Donation Scheme*

82. The IRS discovered that in 2010 alone, there were at least 213 instances in which ownership of a timeshare was transferred directly from a customer to the ultimate buyer, without including Donate for a Cause at all.

83. Defendants know that this was improper. For example, a blog post on the Donate for a Cause website stated:

> Truth: In order to give donors a legitimate tax write-off, the property must first be transferred into a 501(c)3 charity. DFC transfers the timeshare into our registered 501(c)3 non-profit, Project Philanthropy.

84. In many instances, Donate for a Cause issued donation receipts to customers despite never having owned the timeshare.

85. In an effort to promote participation in the timeshare donation scheme, customers were encouraged to accelerate their false tax benefits by manipulating

their state and federal income tax withholdings to match the amount of the anticipated deduction.

86. For example, one such customer was told that he or she:

> can realize immediately the tax benefits of your timeshare donation in 2011 by reducing the amount of State and Federal income taxes you are withholding from your paychecks (or quarterly earnings reports, if self employed) by the amount of your charitable contributions.

## DEFENDANTS KNOW OR HAVE REASON TO KNOW THAT THE TIMESHARE DONATION SCHEME WAS BOGUS

87. Defendants know or have reason to know that the manner in which they value timeshares is contrary to internal revenue laws and regulations, violates the professional standards for real estate appraisers, and results in improper and grossly overvalued timeshare appraisals. They also know or have reason to know that a property's fair market value derives from appropriate, timely data from the market and not conjecture or unsupported conclusions that favor extraordinarily high property value.

88. Defendants know or have reason to know that their customers will use the inflated values provided in their appraisals to claim overstated charitable contribution deductions. Defendants know or have reason to know that this will reduce the federal tax liabilities of their customers.

89. Defendants know that overstated appraisals can subject them to penalty under section 6701(a) (aiding and abetting the understatement of tax liability) and section 6695A (misstatements attributable to incorrect appraisals).

**EXAMPLES OF DEFENDANTS' TIMESHARE DONATION SCHEME**

90. Defendants' timeshare appraisals contain gross errors, omissions, and assumptions, and have repeatedly been offered as support for customers' charitable contribution deductions for donated timeshares.

91. In 2004, Customer 1 purchased a timeshare in Baja California Sur, Mexico, for $10,597.50. Customer 1 was required to pay annual maintenance fees for the timeshare and was entitled to use it one week per year. Customer 1 heard of Donate for a Cause from a radio broadcast and learned that Donate for a Cause promised tax deductions to its customers that donated unwanted timeshares.

92. In 2011, Customer 1 conveyed the timeshare to Donate for a Cause. In 2012, Donate for a Cause used eBay's charity platform to sell the timeshare to a third party for only $81. Resort Closings served as the closing agent, performed the transfer of ownership of the timeshare, and billed Customer 1 approximately $2,800 in fees.

93. In 2012, Tarpey prepared an "Appraisal Form" and appraised the timeshare at $8,740, which is more than *107 times* the amount for which Donate for a Cause sold the timeshare. Customer 1 claimed a charitable contribution

deduction in that exact amount on Customer 1's federal income tax return for the 2011 tax year.  However, Customer 1 was not entitled to that deduction because Tarpey is not a qualified appraiser and because Tarpey failed to perform a qualified appraisal of the timeshare because, in part:

a.  Tarpey failed to use the definition of fair market value as defined in the Treasury Regulations.

b.  Tarpey inappropriately relied on active listings in analyzing comparables and failed to provide sufficient information regarding those comparables.

c.  Tarpey failed to provide sufficient information to evaluate the methodology he used to determine the fair market value.

d.  Tarpey did not inspect the property or comparables.

e.  Tarpey did not include the date of contribution and other salient terms of the agreements between the donor and donee.

f.  Tarpey did not collect, verify, and analyze all information necessary for credible results.

g.  Tarpey failed to meet the minimum requirements of the Uniform Standards of Professional Appraisal Practice.

h.  On IRS Form 8282 (Donee Information Return), Donate for a Cause inaccurately reported the amount that it received from the sale of the timeshare.

94. In 2005, Customer 2 purchased a timeshare in Las Vegas, Nevada for $29,990.  Customer 2 was required to pay annual maintenance fees for the timeshare and was entitled to use it one week per year.

95. In 2010, Customer 2 conveyed the timeshare to Donate for a Cause.  In 2011, Donate for a Cause used eBay's charity platform to sell the timeshare to a third party for only $1,011.  Resort Closings served as the closing agent, performed the transfer of ownership of the timeshare, and billed Customer 2 more than $3,300 in fees.

96. In 2011, Broyles prepared a "Desktop Appraisal Form" and appraised the timeshare at $30,000, which is more than *29 times* the amount for which Donate for a Cause sold the timeshare.  Customer 2 claimed a charitable contribution deduction for $29,274 on Customer 2's federal income tax return for the 2010 tax year.  However, Customer 2 was not entitled to that deduction because Broyles is not a qualified appraiser and because Broyles failed to perform a qualified appraisal of the timeshare because, in part:

a.  Broyles failed to use the definition of fair market value as defined in the Treasury Regulations.

b. Broyles inappropriately relied on active listings in analyzing comparables and failed to provide sufficient information regarding those comparables.

c. Broyles failed to provide sufficient information to evaluate the methodology he used to determine the fair market value.

d. Broyles did not inspect the property or comparables.

e. Broyles did not include the date of contribution and other salient terms of the agreements between the donor and donee.

f. Broyles did not collect, verify, and analyze all information necessary for credible results.

g. Broyles failed to meet the minimum requirements of the Uniform Standards of Professional Appraisal Practice.

97. In 2004, Customer 3 purchased a timeshare in Maui, Hawaii for $16,900. Customer 3 was required to pay annual maintenance fees for the timeshare and was entitled to use it one week per year. However, the timeshare became a burden and Customer 3 began looking for a way to dispose of it. Donate for a Cause advertised itself as a "one-stop shop" that, in exchange for thousands of dollars in fees, would facilitate the entire donation process for Customer 3.

98. In 2011, Customer 3 conveyed the timeshare to Donate for a Cause. Later in 2011, Donate for a Cause used eBay's charity platform to sell the

timeshare to a third party for only $19.  Resort Closings served as the closing agent, performed the transfer of ownership of the timeshare, and billed Customer 3 more than $3,000 in fees.

99. In 2011, Thor prepared a "Restricted Use Report" and appraised the timeshare at $14,500, which is more than *763 times* the amount for which the timeshare had recently sold.  Customer 3 claimed a charitable contribution deduction in that exact amount on Customer 3's federal income tax return for the 2011 tax year.  However, Customer 3 was not entitled to that deduction because Thor failed to perform a qualified appraisal of the timeshare because, in part:

    a.  Thor failed to use the definition of fair market value as defined in the Treasury Regulations.

    b.  Thor inappropriately relied on active listings in analyzing comparables and failed to provide sufficient information regarding those comparables.

    c.  Thor failed to provide sufficient information to evaluate the methodology he used to determine the fair market value.

    d.  Thor did not inspect the property or comparables.

    e.  Thor did not include the date of contribution and other salient terms of the agreements between the donor and donee.

f.  Thor did not collect, verify, and analyze all information necessary for credible results.

g.  Thor failed to meet the minimum requirements of the Uniform Standards of Professional Appraisal Practice.

h.  On IRS Form 8282 (Donee Information Return), Donate for a Cause inaccurately reported the amount that it received from the sale of the timeshare.

## DEFENDANTS MARKETED AND PROMOTED
## THE TIMESHARE DONATION SCHEME

100. To gain customers, defendants made specific promises to customers (and prospective customers) that are demonstrably false.

101. Defendants have used websites located at www.donateforacause.org and www.getridofyourtimeshare.com to market and promote their timeshare donation scheme.

102. These websites are designed to entice customers to join the scheme. They contain information regarding the donation programs, as well as video clips, FAQs, and testimonials from previous customers.

103. Part of defendants' marketing strategy is to associate themselves with well-known charities in order to cloak the timeshare donation scheme with a patina of legitimacy. With promises of helping nationally-renowned charities, defendants entice customers to join their scheme. But in reality, based on defendants'

misrepresentations, the customers claim donations well in excess of fair market value and well in excess of what the charities actually received. The charities receive nothing more than *half* of the paltry sum from the eBay sales.

104. The timeshare donation scheme has been aggressively marketed through numerous local media outlets.

105. For example, Tarpey personally appeared and discussed the purported tax benefits of the timeshare donation scheme in news features broadcast on ABC 7 News in Los Angeles, Fox 10 News in Phoenix, and a Phoenix-area morning news television show, AM Arizona. Tarpey, as noted above, devised and operates the timeshare donation scheme, and boasted of its purported tax benefits to prospective participants.

106. Donate for a Cause has also been discussed and promoted through various other national and local media outlets, including the TODAY Show and Fox 4 News in Kansas City. Clips of these news-based promotions are posted on the front page of the Donate for a Cause website.

107. Through websites, online forums, e-mails, and other communications, defendants have made false statements regarding the overstated net value (to the customer) of a timeshare donation and of the alleged charitable benefit from donating the timeshare. For example:

a. "Get $6,000 for your timeshare fast, easy, hassle-free process 100% risk-free timeshare relief."

b. "Donors receive, on average, $6,500 in tax savings through the donation of their unwanted timeshare. In most cases, the tax savings far exceed the cost of donation, which is just like putting cash back into our owner's pockets."

c. "The average person who donates saves about six thousand dollars come tax time."

d. "Featured in the *Wall Street Journal* and on NBC's *Today* show, DFC guarantees to transfer the deed/ownership out of your name, convert the timeshare to cash and then donate all proceeds to such charities as The American Cancer Society, The National Foundation for Cancer Research, The Alzheimer's Organization, and National Autism Association. But the best part is the significant tax receipt you'll receive (usually $5,000-$10,000) is typically many times more than what you would make even if you could sell your timeshare."

e. "The good news is that any fees you pay DFC will almost always be exceeded by the value of the tax deduction you receive in return."

f. "You do receive a tax receipt for the fee, as well as the appraised value of the timeshare (generally 70-85% of the original purchase price)."

g. "The Appraised Value of each property can also be written off your income taxes. That value is typically about 80% of the original value of the timeshare. The average annual use timeshare has an original value of $15-20,000. Our average donor of an annual use timeshare realizes $4,000 to $6,000 in tax savings."

108. Customers have been told that they can earn a profit from donating their unwanted timeshare and that "[t]his is the only way to get rid of an unwanted timeshare and still make some money off of it."

109. The false and misleading statements include the following promises regarding the mechanics of the donation process. For example:

a. "Upon request, Donate for a Cause will have your donation appraised by a 3rd party licensed appraiser."

b. "DFC has raised approximately $3.5 million for charities through our donation program."

c. "We assist the client in getting [an] independent 3rd party expert opinion" to appraise the fair market value of unwanted timeshares.

## HARM TO THE GOVERNMENT AND THE PUBLIC

110. Since at least 2010, defendants have promoted, operated, and organized a timeshare donation tax scheme that has caused harm to the IRS, to defendants' customers, and to the public.

111. The IRS estimates that since 2010, defendants have caused customers to donate 5,523 timeshares to this scheme, 5,505 of which were sold on eBay.

112. In furtherance of this scheme, Tarpey, Broyles, Thor, and Crowson have prepared thousands of appraisals of timeshares on behalf of Donate for a Cause, all or nearly all of which were used to support federal tax deductions.

113. Based on a sample of only 2,994 customers' files, the IRS determined that defendants' conduct caused more than $19.4 million in improper non-cash charitable contribution deductions between 2010 and 2012. These figures do not include deductions attributable to processing fees paid to Resort Closings, which the IRS estimates may have resulted in an additional $9.1 million in improper cash deductions. The actual amount of improper charitable contribution deductions resulting from the defendants' conduct is likely substantially more.

114. The IRS has expended considerable time and resources to address the timeshare donation scheme. IRS employees, both revenue agents and IRS appraisers, have spent a substantial number of hours examining the timeshare appraisals prepared by defendants.

115. The IRS has been forced to repeatedly disallow the claimed deductions made by customers who have donated unwanted timeshares to Donate for a Cause.

116. The IRS is harmed because it must dedicate scarce resources to detecting and examining inaccurate returns filed by defendants' customers, as well as assessing and collecting unpaid taxes.

117. Defendants' customers are also harmed because they are liable for any unpaid tax, plus interest and penalties, after having paid to participate in the timeshare donation scheme that failed to deliver the promised tax benefits.

118. Defendants' activities undermine public confidence in the fairness of the federal tax system and incite non-compliance with the internal revenue laws.

119. This abuse of the charitable contribution deduction inspires contempt for the system of honest, voluntary income tax reporting.

120. Tarpey continues to promote the timeshare donation scheme, while both Broyles and Crowson continue to prepare appraisals for new donors. They continue to derive substantial income from the timeshare donation scheme.

121. Defendants continue to use the same and unacceptable practices when preparing appraisals.

122. Without an injunction, the United States will suffer irreparable harm from the underpayment of tax liabilities and the exhaustion of resources to enforce the internal revenue laws.

123. An injunction prohibiting defendants from preparing appraisals for any purpose relating to federal taxes is necessary and appropriate to stop their unlawful practices.

124. Without an injunction, the United States will suffer irreparable harm with no legal remedy. The IRS will be required to track, monitor, and examine all future appraisals from defendants that may be submitted in support of customers' charitable contribution deductions to ensure that they are following the laws and regulations applicable to such deductions. IRS examination of an appraisal is a time- and resource-intensive process. The IRS lacks the resources to do this, and so must necessarily rely on the honesty and professionalism of independent appraisers preparing appraisals for taxpayers.

125. The resulting harm to defendants from being enjoined pales in comparison to the harm they have caused to the United States. Prohibiting defendants from further promoting the timeshare donation scheme and preparing appraisals for any purpose relating to federal taxes is appropriate and commensurate with their consistent practice of flouting the internal revenue laws and regulations.

## COUNT I

### INJUNCTION AGAINST ALL DEFENDANTS
### UNDER 26 U.S.C. § 7408 FOR ENGAGING IN CONDUCT
### SUBJECT TO PENALTY UNDER 26 U.S.C. § 6700

126. Section 7408 of the Internal Revenue Code authorizes a court to enjoin persons who have engaged in any conduct subject to penalty under 26 U.S.C. § 6700 if the court finds that injunctive relief is appropriate to prevent recurrence of such conduct.

127. Section 6700 of the Internal Revenue Code imposes a civil penalty on any person who, in connection with organizing, promoting, or selling a plan or arrangement, or assisting in organizing, promoting or selling a plan or arrangement (a) makes or furnishes or causes another person to make or furnish a statement with respect to the allowability of any deduction or credit, the excludability of any income, or the securing of any other tax benefit by reason of participating in the plan or arrangement which the person knows or has reason to know is false or fraudulent as to any material matter; or (b) makes a gross valuation overstatement as to any material matter.

128. A gross valuation overstatement is any statement as to the value of property or services if the value stated exceeds 200 percent of the amount determined to be the correct valuation, and the value of such property or services is

directly related to the amount of any deduction or credit for federal income tax purposes.

129. Defendants' timeshare donation scheme is a plan or arrangement within the meaning of 26 U.S.C. § 6700.

130. Defendants have organized, promoted, and sold the scheme to thousands of customers.

131. In connection with the scheme, defendants have made and furnished false and/or fraudulent statements regarding the allowability of a deduction or credit, the excludability of any income, and/or the securing of any other tax benefit by reason of participating in the scheme.

132. Defendants know and/or have reason to know that these statements are false or fraudulent within the meaning of 26 U.S.C. § 6700(a)(2)(A).

133. In connection with the scheme, defendants made gross valuation overstatements within the meaning of 26 U.S.C. § 6700(a)(2)(B).

134. If defendants are not enjoined, they are likely to continue to promote this scheme.

135. Defendants have engaged in conduct – including but not limited to the conduct described in this complaint – that is subject to penalty under 26 U.S.C. § 6700, and an injunction under 26 U.S.C. § 7408 is appropriate to prevent recurrence of such conduct.

## COUNT II

### INJUNCTION AGAINST ALL DEFENDANTS
### UNDER 26 U.S.C. § 7408 FOR ENGAGING IN CONDUCT
### SUBJECT TO PENALTY UNDER 26 U.S.C. § 6701

136. Section 7408 of the Internal Revenue Code authorizes a court to enjoin persons who have engaged in any conduct subject to penalty under 26 U.S.C. § 6701 if the Court finds that injunctive relief is appropriate to prevent recurrence of such conduct.

137. Section 6701 of the Internal Revenue Code imposes a civil penalty on any person who aids or assists in, procures, or advises with respect to, the preparation or presentation of any portion of a return, claim or other document, who knows (or has reason to believe) that such portion will be used in connection with any material matter arising under the internal revenue laws, and who knows that such portion (if so used) would result in an understatement of the liability for tax of another person.

138. Defendants prepared and presented, or assisted others in preparing and presenting, documents and portions of documents that they knew (or had reason to believe) would be used in connection with material matters arising under the internal revenue laws, and knew that such portions (if so used) would result in understatements of the liabilities for tax of other persons.

139. If defendants are not enjoined, they are likely to continue to promote this tax-fraud scheme.

140. Defendants have engaged in conduct – including but not limited to the conduct described in this complaint – that is subject to penalty under 26 U.S.C. § 6701, and an injunction under 26 U.S.C. § 7408 is appropriate to prevent recurrence of such conduct.

## COUNT III

### INJUNCTION AGAINST ALL DEFENDANTS UNDER 26 U.S.C. § 7402 FOR ENGAGING IN CONDUCT SUBJECT TO PENALTY UNDER 26 U.S.C. § 6695A

141. Section 7402(a) of the Internal Revenue Code authorizes a court to issue orders of injunction as may be necessary or appropriate for the enforcement of the internal revenue laws.

142. Section 6695A of the Internal Revenue Code imposes a civil penalty on any person who appraises property and knows (or reasonably should have known) that the appraisal would be used in connection with a federal tax return or a claim for refund, and the claimed value of the property results in a substantial valuation misstatement or a gross valuation misstatement. A substantial valuation misstatement results when the value of any property claimed is 150% or more of the property's correct valuation (26 U.S.C. § 6662(e)), and a gross valuation

misstatement results when the value of any property claimed is 200% or more of the property's correct valuation (26 U.S.C. § 6662(h)).

143. Defendants knew or reasonably should have known that the appraisals they prepared would be used in connection with a federal tax return or a claim for refund.

144. The appraisals that defendants prepared provide the basis for the value of the charitable contribution deductions claimed on each customer's tax return or claim for refund.

145. Defendants have consistently overvalued appraised property by at least 150%.

146. The conduct that section 6695A penalizes interferes with the enforcement of the internal revenue laws.

147. Defendants have consistently engaged in conduct – including overvaluing appraised property by at least 150% – that is subject to penalty under 26 U.S.C. § 6695A, and an injunction under 26 U.S.C. § 7402 is appropriate to prevent recurrence of such conduct.

## COUNT IV

## INJUNCTION AGAINST ALL DEFENDANTS UNDER 26 U.S.C. § 7402 FOR UNLAWFUL INTERFERENCE WITH THE ADMINISTRATION AND ENFORCEMENT OF THE INTERNAL REVENUE LAWS

148. Section 7402(a) of the Internal Revenue Code authorizes a court to issue orders of injunction as may be necessary or appropriate for the enforcement of the internal revenue laws.

149. Defendants, through the actions described above, have engaged in conduct that interferes substantially with the administration and enforcement of the internal revenue laws. Defendants have promoted an abusive tax scheme and aided and abetted understatements of tax liabilities that have caused millions of dollars in tax harm.

150. Customers continue to claim bogus deductions as a result of the scheme.

151. The scheme has caused irreparable harm to the United States.

152. Defendants' conduct has caused and is causing substantial revenue loss to the United States Treasury, much of which may be unrecoverable.

153. IRS scrutiny has not deterred defendants from promoting this abusive tax scheme, aiding and abetting understatements of tax liabilities, and otherwise interfering with the enforcement of the internal revenue laws.

154. If defendants are not enjoined, they will likely continue to engage in conduct subject to penalty under 26 U.S.C. §§ 6700, 6701, 6695A, and conduct that interferes with the enforcement of the internal revenue laws.

## RELIEF SOUGHT

WHEREFORE, plaintiff United States of America respectfully prays the following:

A. That this Court find that defendants have engaged in conduct subject to penalty under 26 U.S.C. § 6700 and that injunctive relief under 26 U.S.C. § 7408 is appropriate to prevent recurrence of that conduct.

B. That this Court find that defendants have engaged in conduct subject to penalty under 26 U.S.C. § 6701 and that injunctive relief under 26 U.S.C. § 7408 is appropriate to prevent recurrence of that conduct.

C. That this Court find that defendants have engaged in conduct subject to penalty under 26 U.S.C. § 6695A and that injunctive relief under 26 U.S.C. § 7402(a) is appropriate to prevent recurrence of that conduct.

D. That this Court find that defendants have engaged in conduct interfering with the administration and enforcement of the internal revenue laws and that injunctive relief under 26 U.S.C. § 7402(a) is appropriate to prevent recurrence of that conduct.

E. That this Court, pursuant to 26 U.S.C. §§ 7402 and 7408, enter permanent injunctions prohibiting defendants from directly or indirectly:

> (a) preparing (or assisting others in preparing) any property appraisal that will be used in connection with federal taxes;

> (b) encouraging or advising (or assisting others in encouraging or advising) others to claim charitable contribution deductions on any federal tax return; and

> (c) organizing, promoting, selling, marketing or advising with respect to (or assisting others in organizing, promoting, selling, marketing or advising with respect to) any plan or arrangement regarding charitable contribution deductions claimed on federal tax returns.

F. That this Court, pursuant to 26 U.S.C. § 7402, order defendants to identify and collect the names, addresses, e-mail addresses, phone numbers, and Social Security or other tax identification numbers, of all customers for whom they provided a timeshare appraisal since 2010.

G. That this Court, pursuant to 26 U.S.C. § 7402, order defendants to produce to counsel for the United States within 30 days of entry of judgment in this case all of the information that they collected in compliance with paragraph F above.

H. That this Court, pursuant to 26 U.S.C. § 7402, order defendants to send by mail, within 30 days of entry of the judgment in this case and at their own expense, a copy of the judgment in this case to each individual identified in paragraph F above. The mailings may include a cover letter, but such letter must

be in a form either agreed to by counsel for the United States or approved by this Court, and shall not include any other documents or enclosures, unless agreed to by counsel for the United States or approved by this Court.

I. That this Court, pursuant to 26 U.S.C. § 7402, order defendants to prominently display a copy of the final judgment of permanent injunction in this case on the front page of all websites defendants control or maintain to advertise or market the timeshare donation scheme.

J. That this Court, pursuant to 26 U.S.C. § 7402, order defendants to provide, within 30 days of entry of the judgment in this case, a copy of the judgment in this case to all of their employees, independent contractors, directors, and officers, and provide to counsel for the United States within 30 days of the Court's judgment a signed and dated acknowledgment of receipt for each person who was provided such a copy.

K. That this Court, pursuant to 26 U.S.C. § 7402, order defendants to file with the Court, within 45 days of entry of the judgment in this case, a certification signed under penalty of perjury that they have complied with paragraphs F, G, H, I, and J above.

L. That this Court permit the United States to engage in post-judgment discovery to ensure and monitor compliance with the judgment in this case.

M. That this Court retain jurisdiction over this action for the purpose of implementing and enforcing the judgment in this case.

N. That this Court, pursuant to Rule 65(d)(2) of the Federal Rules of Civil Procedure, order that entry of the judgment in this case binds the following who receive actual notice of it by personal service or otherwise:

    a. defendants James Tarpey; Project Philanthropy, Inc. d/b/a Donate for a Cause; Timeshare Closings, Inc. d/b/a Resort Closings, Inc.; Ron Broyles; Curt Thor; and Suzanne Crowson;

    b. the officers, agents, servants, employees, and attorneys of each of the defendants described in (a) above; and

    c. other persons who are in active concert or participation with anyone described in (a) or (b) above.

O. That this Court grant the United States such other and further relief as the Court deems appropriate.

//

//

//

//

//

//

//

//

//

Dated:  November 23, 2015

Respectfully submitted,

CAROLINE D. CIRAOLO
Acting Assistant Attorney General

/s/Harris J. Phillips
HARRIS J. PHILLIPS
Massachusetts Bar #675603
RICHARD G. ROSE
District of Columbia Bar #493454
Trial Attorneys, Tax Division
U.S. Department of Justice
P.O. Box 7238
Ben Franklin Station
Washington, D.C.  20044
Telephone: (202) 616-1906 (Phillips)
Telephone: (202) 616-2032 (Rose)
Fax: (202) 514-6770
Harris.J.Phillips@usdoj.gov
Richard.G.Rose@usdoj.gov

MICHAEL W. COTTER
United States Attorney

*Attorneys for the United States*

# PLAINTIFF'S DECLARATION

A.  I understand I must keep the Court informed of my current mailing address and my failure to do so may result in dismissal of this Complaint without notice to me.

B.  I understand the Federal Rules of Civil Procedure prohibit litigants filing civil complaints from using certain information in documents submitted to the Court.  In order to comply with these rules, I understand that:

- social security numbers, taxpayer identification numbers, and financial account numbers must include only the last four digits (e.g. xxx-xx-5271, xx-xxx5271, xxxxxxxx3567);
- birth dates must include the year of birth only (e.g. xx/xx/2001); and
- names of persons under the age of 18 must include initials only (e.g. L.K.).

If my documents (including exhibits) contain any of the above listed information, I understand it is my responsibility to black that information out before sending those documents to the Court.

<u>I understand I am responsible for protecting the privacy of this information.</u>

C.  I understand the submission of a false statement or answer to any question in this complaint may subject me to penalties for perjury.  I declare under penalty of perjury that I represent the Plaintiff in this action, I have read this complaint, and the information I set forth herein is true and correct. 28 U.S.C. § 1746; 18 U.S.C. § 1621.

Executed at Washington, D.C. on November 23, 2015.

<div style="margin-left: 50%">

/s/Harris J. Phillips
HARRIS J. PHILLIPS
Massachusetts Bar #675603
RICHARD G. ROSE
District of Columbia Bar #493454
Trial Attorneys, Tax Division
U.S. Department of Justice
P.O. Box 7238, Ben Franklin Station
Washington, D.C.  20044
Telephone: (202) 616-1906 (Phillips)
Telephone: (202) 616-2032 (Rose)
Fax: (202) 514-6770
Harris.J.Phillips@usdoj.gov
Richard.G.Rose@usdoj.gov

*Attorneys for the United States*

</div>